**Fannie THOMAS, Plaintiff-Appellee-Cross Appellant,**

v.

**MYERS–DICKSON FURNITURE COMPANY, Defendant-Appellant-Cross Appellee.**

No. 72-3461.

United States Court of Appeals,
Fifth Circuit.

June 7, 1973.

Cleburne E. Gregory, Alexander Cocalis, John C. Gray, Atlanta, Ga., for appellant.

John Harris Paer, Atlanta, Ga., for appellee.

Before BELL, GOLDBERG and SIMPSON, Circuit Judges.

GOLDBERG, Circuit Judge:

Chief Justice Burger has very recently expressed the guiding philosophy for our interpretation of the Federal Consumer Credit Protection Act, 15 U.S.C. §

1601 et seq., more popularly known as the Truth in Lending Act, and Regulation Z, 12 C.F.R. § 226, promulgated thereunder, see 15 U.S.C. § 1604:

"Passage of the Truth-in-Lending Act in 1968 culminated several years of congressional study and debate as to the propriety and usefulness of imposing mandatory disclosure requirements on those who extend credit to consumers in the American market. By the time of passage, it had become abundantly clear that the use of consumer credit was expanding at an extremely rapid rate. From the end of World War II through 1967, the amount of such credit outstanding had increased from $5.6 billion to $95.9 billion, a rate of growth more than 4½ times as great as that of the economy. Yet, as the congressional hearings revealed, consumers remained remarkably ignorant of the nature of their credit obligations and of the costs of deferring payment. Because of the divergent, and at times fraudulent, practices by which consumers were informed of the terms of the credit extended to them, many consumers were prevented from shopping for the best terms available and, at times, were prompted to assume liabilities they could not meet. Joseph Barr, then Under Secretary of the Treasury, noted in testifying before a Senate subcommittee that such blind economic activity is inconsistent with the efficient functioning of a free economic system such as ours, whose ability to provide desired material at the lowest cost is dependent on the asserted preferences and informed choices of consumers.

"The Truth-in-Lending Act was designed to remedy the problems which had developed. The House Committee on Banking and Currency reported, in regard to the then proposed legislation:

'[B]y requiring all creditors to disclose credit information in a uniform manner, and by requiring all additional mandatory charges imposed by the creditor as an incident to credit be included in the computation of the applicable percentage rate, the American consumer will be given the information he needs to compare the cost of credit and to make the best informed decision on the use of credit.'

This purpose was stated explicitly in § 102 of the legislation enacted:

'The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaging in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the costs thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit.'

"The hearings held by Congress reflect the difficulty of the task it sought to accomplish. Whatever legislation was passed had to deal not only with the myriad forms in which credit transactions then occurred, but also with those which would be devised in the future. To accomplish its desired objective, Congress determined to lay the structure of the Act broadly and to entrust its construction to an agency with the necessary experience and resources to monitor its operation. Section 105 delegated to the Federal Reserve Board broad authority to promulgate regulations necessary to render the Act effective. The language employed evinces the awareness of Congress that some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish. It indicates as well the clear desire of Congress to insure that the Board had adequate power to deal with such attempted evasion. In addition to granting to the Board the authority normally given to administrative agencies to promulgate regulations

designed to 'carry out the purposes' of the Act, Congress specifically stated:

'These regulations may contain such classifications, differentiations, or other provision, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper . . . to prevent circumvention or evasion [of the Act], or to facilitate compliance therewith.'

The Board was thereby empowered to define such classifications as were reasonably necessary to insure that the objectives of the Act were fulfilled, no matter what adroit or unscrupulous practices were employed by those extending credit to consumers."

Mourning v. Family Publications Service, Inc., 1973, 411 U.S. 356, 93 S.Ct. 1652, 1657, 36 L.Ed.2d 318, (1973) (footnotes omitted), reversing 5 Cir. 1971, 449 F.2d 235. Further, in the words of Chief Justice Burger we are told:

"The Truth-in-Lending Act reflects a transition in congressional policy from a philosophy of let-the-buyer-beware to one of let-the-seller-disclose. By erecting a barrier between the seller and the prospective purchaser in the form of hard facts, Congress expressly sought 'to . . . avoid the uniformed use of credit.' 15 U.S.C. § 1601. Some may claim that it is a relatively easy matter to calculate the total payments to which petitioner was committed by her contract with respondent; but at the time of sale, such computations are often not encouraged by the solicitor or performed by the purchaser. Congress has determined that such purchasers are in need of protection . . . .

"That the approach taken may reflect what respondent views as an undue paternalistic concern for the consumer is beside the point. The statutory scheme is within the power granted to Congress under the Commerce Clause. It is not a function of the courts to speculate as to whether the statute is unwise or whether the evils sought to be remedied could better have been regulated in some other manner."

*Id.*, 411 U.S. at 377, 93 S.Ct. at 1664 (footnotes omitted).

This is a case raising three important questions of first impression regarding the proper application of various provisions of the Truth in Lending Act and Regulation Z. More specifically, we are here concerned with Regulation Z's requirement that creditors include the cost of "credit life insurance" in the computations of "finance charges" and "annual percentage rates" that they are required to disclose to consumers. *See* 12 C.F.R. § 226.4(a)(5). We are called upon to decide (1) whether "open end credit accounts" in existence prior to the effective date of the regulatory scheme must nonetheless strictly comply with those disclosure requirements, (2) whether the statutorily minimum damages may be imposed for each incorrect disclosure of this information and thus are not limited to one imposition per customer account, *i. e.*, whether minimum damages may be imposed for each violative "periodic statement," and (3) whether attorney's fees may be awarded for work done on appeal on behalf of a successful litigant. Only the first two of these questions were before the trial judge, and he answered both in the affirmative. We agree that these issues were correctly decided, and we affirm both holdings. As to the third issue, we conclude that attorney's fees are authorized for appellate legal work, and we here award such fees in an amount to be determined by the District Court.

## I. THE FACTUAL SETTING & ACTION BELOW

The facts giving rise to this action are not seriously disputed. Plaintiff, Fannie Thomas, opened an "open end credit account"[1] with defendant,

---

1. Section 226.2(r) of Regulation Z defines the term as follows:

"'Open end credit' means consumer credit extended on an account pursuant

Myers-Dickson Furniture Company, on October 16, 1968, at which time she made an initial purchase. She made additional purchases on April 14, 1970, September 25, 1970, and November 13, 1970, and each time the amount of the purchase was added to her account balance. During the period here in question, September 1970 to August 1971, defendant sent plaintiff eleven monthly statements of her account and plaintiff made one payment each month.

The Truth in Lending Act and Regulation Z became effective on July 1, 1969. On June 28, 1969, defendant had mailed plaintiff a "credit disclosure" letter in compliance with § 226.7(f) of Regulation Z.[2] Among the terms disclosed in the letter was the cost of credit life insurance carried on plaintiff's account with defendant. Defendant thereafter continued sending plaintiff monthly statements of her account, including the eleven statements here in question, none of which included the cost of credit life insurance *as an element of the "finance charge"* stated on each document. Each of the monthly statements did, however, contain a separately stated charge for credit life insurance.[3] Since plaintiff was not required to and never chose to pay the entire outstanding balance on her account at one time, each "periodic statement" imposed a different and additional "finance charge" (computed on the then outstanding balance) as well as a new and different credit life insurance charge.

One of the disclosure requirements created by the Act and Regulation Z was that the "finance charge" must include, *inter alia*, the following:

> "(5) Charges or premiums for credit life, accident, health, or loss of income insurance, written in connection with any credit transaction unless
>
> > (1) The insurance coverage is not required by the creditor and this fact is clearly and conspicuously disclosed in writing to the customer; and
> >
> > (2) Any customer desiring such coverage gives specific dated and separately signed affirmative written indication of such desire after receiving written disclosure to him of the cost of such insurance."

---

to a plan under which (1) the creditor may permit the customer to make purchases or obtain loans, from time to time, directly from the creditor or indirectly, by use of a credit card, check, or other device, as the plan may provide; (2) the customer has the privilege of paying the balance in full or in installments; and (3) a finance charge may be computed by the creditor from time to time on an outstanding unpaid balance. The term does not include negotiated advances under an open end real estate mortgage or a letter of credit."

2. Section 226.7(f) provides as follows:
   "(f) *Open end credit accounts existing on July 1, 1969.* In the case of any open end credit account in existence and in which a balance remains unpaid on July 1, 1969, and which balance is deemed to be collectible and not subject to delinquency collection procedures, the items described in paragraph (a) of this section, to the extent applicable, shall be disclosed in a notice mailed or delivered to the customer not later than July 31, 1969. . . . "

3. The periodic statement defendant sent plaintiff in September 1970, for example, showed the following figures typed onto a form:

| | |
|---|---|
| Previous Balance: | 255.70 |
| Purchases and Charges: | 66.85 (09–26) |
| Payments and Credits: | 20.00 (09–26) |
| Finance charge rate applied to this average balance: | 321.26 |
| FINANCE CHARGE: | 4.82 |
| Credit Life Ins.: | .49 |
| New Balance: | 307.86 |
| Periodic Rate: | 1.50% per month |
| Annual Percentage Rate: | 18.0% |

Regulation Z, 12 C.F.R. § 226.4(a)(5). It is uncontested that plaintiff never gave defendant a separately signed and dated insurance authorization and that defendant sent plaintiff eleven monthly statements after the effective date of the regulatory scheme that did not include the cost of credit life insurance charges within the "finance charge" itself.

Plaintiff filed this action under the Truth in Lending Act,[4] alleging that defendant's failure to include the insurance charges in the "finance charge" constituted violations of § 226.4(a)(5). The court below agreed and, following a non-jury trial, entered judgment for plaintiff. Ruling that each statement that failed to include the insurance charge in the "finance charge" constituted a separate violation, the court granted plaintiff damages of $1,100, the statutory minimum for each violation being $100 and there being eleven such defective "periodic statements." Finally, the court heard testimony regarding an award of attorney's fees, which is specifically authorized by § 130 of the Truth in Lending Act, 15 U.S.C. § 1640, and awarded plaintiff $500 in attorney's fees as well as the costs of her action.

Defendant brings this appeal, arguing that it was not required to comply with § 226.4(a)(5) as to pre-existing accounts and that, even if it was, the Act contemplates only one award of minimum damages per account. Plaintiff cross-appeals, arguing that the award of attorney's fees already granted is insufficient and an abuse of discretion and that attorney's fees for work done on appeal ought also to be awarded.

## II. APPLICABILITY OF DISCLOSURE REQUIREMENTS TO PRE–EXISTING ACCOUNTS

There is no question that a violation of § 226.4(a)(5) would have been shown here if plaintiff had opened her account with defendant *after* the effec-

tive date of the Act. In each of the eleven challenged "periodic statements," defendant failed to include the insurance charge within the "finance charge" shown on the statement, even though defendant did not have a "specific dated and separately signed" insurance authorization from plaintiff. Indeed, if defendant has improperly understated the "finance charge," it has also improperly understated the "annual percentage rate," which is computed from the "finance charge." *See* 12 C.F.R. § 226.5.

Plaintiff's account having been opened before the Act became effective, defendant argues that because it has complied with § 226.7(f) of Regulation Z by sending the letter of June 28, 1969, it need not now comply with § 226.4(a)(5). We cannot agree. Section 226.7(f) merely provides that:

> "In the case of any open end credit account in existence and in which a balance remains unpaid on July 1, 1969 . . . the items described in paragraph (a) of this section [the terms that a creditor must disclose to a customer *opening an account* after the Act becomes effective] . . . shall be disclosed in a notice mailed or delivered to the customer not later than July 31, 1969. . . ."

Defendant argues that this language creates a "grandfather clause" excusing all pre-existing "open end credit accounts" from compliance with the ongoing disclosure requirements of § 226.4(a)(5), but nowhere in the Act or in Regulation Z do we find any such exception. Defendant argues nonetheless that such an exception should be implied from two factors. First, defendant relies on the fact that pre-existing "open end credit accounts" are not mentioned elsewhere in Regulation Z to support the inference that § 226.7(f) contains the *only* disclosure requirements applicable to such pre-existing accounts. Secondly, defendant urges that the "obvious intent of this [§ 226.7(f)] disclosure to existing accounts was to relieve a business from

---

4. Such actions are authorized by 15 U.S.C. § 1640(e) and 28 U.S. § 1337.

the impractical requirement of obtaining signed credit life elections and disclosures from the holders of its numerous existing accounts. . . ."

Defendant's efforts to create an "existing-accounts exception" from the disclosure requirements of Regulation Z must fail. As to its first theory, we deem it sufficient to iterate that "exceptions" not mentioned in the Act should not lightly be read into it, Buford v. American Finance Co., N.D.Ga.1971, 333 F.Supp. 1243, 1247, and we can perceive no good reason for our creating the exception defendant here urges. *See also* Mourning v. Family Publications Service, Inc., *supra*. Nor is defendant's second theory persuasive, for we understand that the promulgation of § 226.7(f) reveals an altogether different intent. Section 226.7 sets out the specific disclosures required for all "open end credit accounts." Section 226.7(a), for example, lists eight items that must be disclosed—at the time an account is opened—to every customer who opens such an account after the effective date of the Act. Rather than creating a special category of "open end credit accounts," we think it clear that § 226.7(f) merely guarantees that pre-existing "open end credit accounts" will receive the identical level of protection that such post-Act accounts are afforded. Under § 226.7(a) "new" accounts are given certain disclosures at the time of opening; "old" accounts are placed on a par by the requirement that the same disclosures be made after the Act's effective date, *i. e.*, under the circumstances enumerated in § 226.7(f). Furthermore, we reject the argument that creditors may excuse their actions not in compliance with the regulatory scheme by arguing that to comply will place a "commercially unfeasible burden" on them. *E. G.*, Douglas v. Beneficial Finance Co., D.Alas.1971, 334 F.Supp. 1166, 1175, rev'd on other grounds, 9 Cir. 1972, 469 F.2d 453. In that regard, we note that at the time defendant sent out its § 226.7(f) disclosure letters, it

might have been able to ease its "burden" by including a § 226.4(a)(5) insurance authorization form in the same envelopes.

Defendant's view of this case misconceives the central thrust of the Truth in Lending Act and Regulation Z. The stated purpose of the Act's disclosure provisions is "to assure a meaningful disclosure of credit terms so that the customer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601. *See also* Mourning v. Family Publications Service, Inc., *supra*, 411 U.S. at 363–369, 93 S.Ct. 1652, § I. In order to enhance the consumer's ability to shop for credit intelligently, the Act created the terms "finance charge" and "annual percentage rate" as standards that the consumer might look to in determining the actual cost to him of using credit. Buford v. American Finance Co., *supra*. *See also* Ratner v. Chemical Bank New York Trust Co., S.D.N.Y.1971, 329 F.Supp. 270; Bostwick v. Cohen, N.D.Ohio 1970, 319 F.Supp. 875. To implement this general purpose, two types of disclosures are required for "open end credit accounts." First, a disclosure must be made when the account is opened advising the consumer *what will or may happen* to his account. *See* § 226.7(a). Defendant has complied with this requirement by sending plaintiff the notice contemplated by § 226.7(f). But secondly, the creditor is required to send "periodic statements" to users of its "open end credit accounts" advising them *what has happened* to their accounts. *See* § 226.7(b).

The regulatory scheme is clearly intended to allow consumers to look to *one* place on the "periodic statement" to see what the cost of credit is, and defendant admits that the statement it sent plaintiff would violate Regulation Z, 12 C.F.R. § 226.4(a)(5), if employed for accounts opened after July 1, 1969. That seemingly harsh result is necessary,

however, if consumers are to be able to (1) intelligently shop for credit, and (2) intelligently assess the costs of continuing to use that credit. Defendant has failed to include a required item within its listing of the "finance charge" on the "periodic statements" it sent plaintiff, and we hold that this non-disclosure is excused neither by the fact that this individual "open end credit account" was opened before the effective date of the Act nor by the fact that defendant has complied with § 226.7(f).

The biologism of the "grandfather clause" suggested by defendant would project progeny and lineal descendants *ad infinitum*. Instead of establishing this anomolous result, a realistic reading suggests that Regulation Z was intended to delineate the specifics of charges imposed after the Act's effective date and necessitates a continuum of their monthly permutations. It would have been a simple matter and the grist of their daily Congressional mill for the Congress to have employed explicit words of prospectivity if such a result had been intended. We are satisfied that violations of § 226.4(a)(5)'s disclosure requirements have been established, and we turn now to a consideration of the proper measure of damages for those violations.

## III. COMPUTATION OF DAMAGES

■ Once a violation has been found under the Act or its implementing regulations, damages are set by § 130 of the statute:

"(a) *Failure to disclose.*

"Except as otherwise provided in this section, any creditor who fails in connection with any consumer credit transaction to disclose to any person any information required under this part to be disclosed to that person is liable to that person in an amount equal to the sum of

(1) twice the amount of the finance charge in connection with the transaction, except that the liability under this paragraph shall not be less than $100 nor greater than $1,000; and

(2) in the case of any successful action to enforce the foregoing liability, the costs of the action together with a reasonable attorney's fee as determined by the court."

15 U.S.C. § 1640. Thus, under the statute, the amount of damages to be awarded when disclosure violations are found is not discretionary: The court must award the successful litigant-consumer twice the "finance charge" involved in the relevant transaction, with the minimum award being $100 and the maximum being $1,000. The principal issue that we must decide regarding the application of the statute is whether use of the word "transaction" in § 1640(a) limits the creditor's liability to any one customer for disclosure violations to one imposition of damages in the $100 to $1,000 range. We hold that damages are not so limited.

The parties have not cited to us any legislative history that can guide our interpretation of the statute, and our reading of the appropriate Congressional reports reveals that the problem seems not to have been addressed in language more specific than the statute itself.[5] We must therefore turn elsewhere for guidance as to the meaning of "transaction" as used in § 1640(a).

■ Defendant insists that the word "transaction" carries with it an implied Congressional rejection of assigning the meaning "violation" to the statute. The sole authority relied upon to support this argument is the "Annual Report to Congress for the Year 1971 by the Board of Governors of the Federal Re-

---

5. *E. g.*, H.R.Rep.No.1040, H.R.Banking & Currency Comm.Rep. on H.R. 11,601, 90th Cong., 2d Sess., U.S.Code Congressional & Administrative News at p. 1976 (1968) ("a minimum penalty of $100 and a maximum penalty not to exceed $1,000 on any individual credit transaction"); *id.*, at p. 1987 ("a minimum of $100 and a maximum of $1,000 for failure to comply with" the disclosure requirements of the Act).

serve System on Truth in Lending," which states as follows:

> "Section 130 of the Act [15 U.S.C. § 1640] provides that a creditor is liable for a minimum of $100 for failure to make proper disclosure in connection with any consumer credit transaction. There is some uncertainty as to the meaning of 'transaction' when applying Section 130 to a possible error on a periodic statement used in connection with an open account. It might be contended that each separate purchase for which a credit card is used constitutes a 'transaction' for purposes of Section 130, or that each periodic statement is a transaction. More likely the opening and use of the account is a single transaction."

*Id.* at p. 18. Although official Federal Reserve Board interpretations of the Act are normally entitled to great weight, *see* Douglas v. Beneficial Finance Co., *supra,* 334 F.Supp. at 1175–1176, we note that the above-cited report does not purport to be an official Board interpretation, was not promulgated pursuant to the Board's rule-making or legislative function, and is not binding on the Board itself; rather, the quoted portion of the report is merely a suggestion that the stated interpretation is the "more likely" meaning of the statute. The suggested interpretation is by no means binding on this Court, and we decline to follow it.

Within the "open end credit account" context, "transaction" more logically refers to each "periodic statement." One of the primary characteristics of these accounts is that "the customer has the privilege of paying the balance in full or in installments," *see* note 1 *supra,* and each month's billing statement may therefore be viewed as an invitation to the customer to decline to pay off the balance and instead to "carry his account on credit" with a new and different "finance charge" being imposed. Conversely, the limitation defendant urges us to place on the statute would be both illogical and inconsistent with the

purposes of the Act. Defendant's argument reduces itself to the basic proposition that the opening and use of an "open end credit account" is a single "transaction" and the only event covered by the statute. How that interpretation could be applied to an ongoing series of sales and monthly billings is not clear. If, for example, a customer purchased an item one year and paid a "finance charge" of $50, the customer would, upon discovering a violation of the Act or Regulation's Z disclosure provisions, be able to recover twice the "finance charge" or $100. If the next year the same customer were to purchase a second item and incur a "finance charge" of $500, he would normally be entitled to recover $1,000 upon the discovery of a disclosure violation. Under defendant's view of the statute, however, the creditor could never be liable for a cumulative total in excess of $1,000, and the plain words of § 1640(a) thus could not be applied to the second violation. The facts of the instant case also demonstrate the difficulty with defendant's position. This particular customer, Fannie Thomas, made four separate purchases from defendant—three after the Act took effect—and she received eleven different "periodic statements," each of which imposed a new and different "finance charge." Each statement solicited, albeit *sub silentio,* a new credit obligation to extend some portion of her outstanding balance for yet another month.

Finally, it is undisputed that the mandatory disclosure provisions of the Act and Regulation Z apply with equal force to each and every "periodic statement," and we note that the word "transaction" is used elsewhere in Regulation Z in what is obviously a plural context. *See* § 226.7(a). Under the totality of the circumstances herein enumerated, we hold that as to "open end credit accounts," each "periodic statement" that imposes a new "finance charge" constitutes a separate transaction within the meaning of 15 U.S.C. § 1640(a).

## IV. ATTORNEY'S FEES

Plaintiff cross-appeals from the trial court's allegedly insufficient award of attorney's fees, which are specifically provided for in the Act:

"[I]n the case of any successful action to enforce the foregoing liability, the costs of the action together with a reasonable attorney's fee as determined by the court."

15 U.S.C. § 1640(a)(2). At the conclusion of the action below, the trial judge conducted a hearing in which he explored, *inter alia*, the amount of time plaintiff's attorney spent on this case, the amount of time other lawyers might have spent on her case had they represented her, the hourly rate plaintiff's attorney usually charged his clients, and the prevailing rate charged by lawyers of similar age and experience in the area. The court, without stating his reasons, then awarded plaintiff $500 in attorney's fees.

Section 1640(a)(2) leaves the determination of what fee is "reasonable" to the court, and plaintiff admits that the test on appellate review is whether the trial judge abused his discretion. *E. g.*, Weeks v. Southern Bell T. & T. Co., 5 Cir. 1972, 467 F.2d 95. Applying that test to the instant facts, we find that the $500 award falls within the range of amounts that could be called reasonable. That figure could, for example, be calculated by multiplying "hours reasonably expended" (as testified to at the hearing) by "reasonable rate per hour" (again on the basis of testimony before the court). The award is admittedly at the lower end of the scale of fees that could have been determined on the basis of the conflicting testimony before the court, but without suggesting that the court is either bound or limited in any way by such testimony, *see* Weeks v. Southern Bell T. & T. Co., *supra*, we find that no abuse of discretion occurred here.

■ Plaintiff argues further, however, that even if the award already entered is not increased, separate fees should be allowed for her attorney's work on this appeal. We agree, for the Act allows fees in "any successful action," and an action cannot be said to be "successful" when an appeal is taken *unless* the victory below is defended on appeal. Accordingly, we direct that the District Court (1) conduct a further hearing and determine the amount that will reasonably compensate plaintiff's attorney for his efforts expended on appeal, and (2) enter an order awarding that amount as attorney's fees under § 1640(a)(2). We are confident that in determining this amount, the able trial judge will take into account the fact that plaintiff's attorney has won his client's case in a new and difficult area of the law.

## V. CONCLUSION

The result we reach today is consistent with the statute's goal of creating a system of "private attorney generals" who will be able to aid the effective enforcement of the Act. Section 1640 is intended to allow aggrieved consumers to participate in policing the Act, Ratner v. Chemical Bank New York Trust Co., *supra*, and its language should be construed liberally in light of its broadly remedial purpose. *Id.* The domain of consumer credit with its allied commercial practices is no longer in the *laissez faire* era of *caveat emptor*. That doctrine is increasingly relegated to its proper place as a historical relic without modern application. The regulatory scheme forcefully expounds an emerging ethic of *"caveat vendor,"* and we will not strain to avoid giving effect to the Federal Consumer Credit *Protection* Act.

Affirmed and remanded for a hearing on attorney's fees on appeal.