292 N.J. Super. 241 (1994)
678 A.2d 759
IRIS GREEN, PLAINTIFF,
v.
CONTINENTAL RENTALS, DEFENDANT. ROBERT J. DEL TUFO, ATTORNEY GENERAL OF NEW JERSEY, INTERVENOR,
v.
ROSEANN LEVINE, PLAINTIFF,
v.
CONTINENTAL RENTALS.
Superior Court of New Jersey, Law Division Passaic County.
Decided March 25, 1994.
*244 Madeline L. Houston for plaintiffs (Passaic County Legal Aid Society).
Victor Rabbat for defendant (Rabbat & Rabbat).
Nancy Costello Miller for Intervenor, State of New Jersey (Robert J. Del Tufo, Attorney General of the State of New Jersey).
*245 Lawrence S. Lustberg for Amicus Curiae, Consumers' League of New Jersey (Crummy, Del Deo, Dolan, Griffinger & Vecchione).
ALTERMAN, J.S.C.
These cross-motions for partial summary judgment require the court to decide whether a "rent-to-own contract" is subject to the provisions of specific federal and state consumer-oriented statutes. Plaintiffs contend, in these consolidated actions for damages, that the rent-to-own contract is subject to the provisions of the Truth In Lending Act, the New Jersey Retail Installment Sales Act, the Uniform Commercial Code, and the New Jersey Consumer Fraud Act, as well as other common law causes of action. The rent-to-own contract has not previously been examined in this jurisdiction, but it has been extensively considered elsewhere.
Generally, the rent-to-own business provides low-income consumers with the ability to immediately obtain possession of household furniture and appliances. It evolved in response to the rapid growth of consumer credit in the 1960's and 1970's, and the resulting proliferation of credit-regulating statutes. The business is designed to deal with persons who are unable to obtain credit in the usual credit market. Nehf, Effective Regulation of Rent-to-Own Contracts, 52 Ohio St. L.J. 751 (1990).
Typically, the rent-to-own contract is styled as a lease renewal from week-to-week or month-to-month. Upon renewal for the stipulated number of weeks or months, the "lessee" obtains ownership of the personal property. The "lessee" has the option to terminate the lease at any time in this fashion, and can eliminate a financial burden at any time. In return, the consumer ordinarily pays considerably more for the item than the retail price and loses any equity that may have accrued before termination of the agreement if less than all the specified renewals are made.
Following the general pattern of rent-to-own contracts, the agreements made between Continental and plaintiff Iris Green and Continental and plaintiff Roseann Levine followed this pattern. *246 Each agreement provided that the customer is the "renter" or "lessee" of the property; that the customer does not own the merchandise and will not own it unless she makes the appropriate number of payments or chooses early to pay the full amount due; that if the customer opts to purchase early, she would be credited with forty percent of all payments made towards the purchase price; that ownership will be obtained by renewing the lease for the specified number of weekly or monthly lease terms; that the lease is renewed for an additional term at the end of each term by making payment of the next rental payment; that if all the renewal payments are made, the customer will become the owner of the property without the payment of any additional consideration; that the customer is fully responsible for the loss, theft, or destruction of the property from all causes; that the customer may terminate the agreement, at any time, by returning the property in its present condition and by payment of all rental payments then due; that at Continental's option, the agreement terminates upon the customer's failure to renew the lease by making the rental payment next due.
Plaintiff Iris Green entered into five agreements with Continental:
A. On April 30, 1988, she signed an agreement to pay $64.29 monthly for eighteen months for living room furniture;
B. On June 2, 1988, she signed an agreement for two endtables, agreeing to make monthly payments of $21.50 for eighteen months;
C. On September 30, 1988, she signed an agreement for a stereo and deep freezer. She made an initial payment of $39.19 and agreed to pay the balance in thirty-nine bi-weekly payments of $51.80 each;
D. On October 4, 1988, she made an agreement for a washing machine, agreeing to make eighteen monthly payments of $55.69 each;
*247 E. On March 31, 1989, she entered into an agreement for a dinette and hutch, agreeing to make seventy-eight weekly payments in the amount of $26.95 each.
On April 1988 through August 1989, Iris Green made payments on account of these agreements. At times, late payments were accepted by Continental, which charged a late fee of $1.00 per day. When partial payments were made, Continental distributed them among all or some of the five agreements. On August 28, 1989, in consequence of Green's defaulted payments, Continental repossessed all of the items.
Roseann Levine entered into an agreement with Continental for a clothes washer and dryer. She agreed to make seventy-eight weekly payments in the amount of $23.95 each. She defaulted after making forty-three payments and Continental repossessed the equipment.
Plaintiffs then commenced these actions.

I.

TRUTH IN LENDING AND RETAIL INSTALLMENT SALES
The Truth-In-Lending Act (TILA), 15 U.S.C. § 1601, et seq., defines "credit sale" as:
"... any sale in which the seller is a creditor. The term includes any contract in the form of a bailment or lease if the bailee or lessee contracts to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the property and services involved and it is agreed that the bailee or lessee will become or for no other or nominal consideration will become the owner of the property on full compliance with his obligation under the contract." 15 U.S.C. § 1602(g).
Whether TILA applies to rent-to-own contracts, is centered upon the "contracts to pay" language in this definition. In Stewart v. Remco Enterprises, Inc., 487 F. Supp. 361 (D.Neb. 1980), the customer agreed to pay $21.00 for seventy-eight weeks for rental of a television set. The agreement required the customer "to rent the property for only one rental period," and provided *248 that he could thereafter terminate the agreement at the end of any rental period by returning the property to defendant. If the customer made all seventy-eight weekly payments, defendant was obliged to transfer ownership of the television set to him. The court held that the agreement was not a "credit sale" under TILA because the customer had not agreed to pay all seventy-eight payments. His obligation was to pay the first week's rental only  a total of $21.00, an amount far less than the aggregate value of the property as required for a "credit sale." This conclusion, the court stated was "buttressed" by letter opinions of the Federal Reserve Board's interpretation of the "contracts to pay" language of the statute and Regulation Z, promulgated by the Federal Reserve Board under the power delegated to it to adopt rules and regulations to effectuate the purposes of TILA. 15 U.S.C. § 1604(a). Regulation Z, 12 C.F.R. § 226.2(s), 12 C.F.R. § 226.2(t), essentially tracks the statutory definition of "credit sale".
The rationale in Stewart, supra, and Regulation Z underpins similar decisions in a number of cases. Smith v. ABC Rental Systems of New Orleans, 491 F. Supp. 127, 129 (E.D.La. 1978), affirmed 618 F.2d 397 (5th Cir.1980), plaintiff was "never obligated for a sum other than the weekly rental for each week he chose to keep the set"; Lemay v. Stroman's, Inc., 510 F. Supp. 921, 923 (E.D.Ark. 1981), the "sole payment the plaintiff agreed to make and was obligated to make was the first week's payment for rent"; Dodson v. Remco Enterprises, Inc., 504 F. Supp. 540 (E.D.Va. 1980), a credit sale contemplates "that the lessee must be obliged to pay a sum substantially equivalent to or in excess of the aggregate value of the property."
The Federal Reserve Board opinions, although entitled to substantial deference, Gantt v. Commonwealth Loan Co., 573 F.2d 520, 523 (8th Cir.1978), are not binding on the court. Southeastern Community College v. Davis, 442 U.S. 397, 410-11, 99 S.Ct. 2361, 2369-70, 60 L.Ed.2d 980, 991 (1979); Griffith v. Superior Ford, 577 F.2d 455, 458 (8th Cir.1978); Thomas v. Myers-Dickson *249 Furniture Co., 479 F.2d 740, 747 (5th Cir.1973). Accordingly, other courts, having greater regard for the history and remedial purpose of TILA have reached the opposite result.
In Clark v. Rent-It-Corp., 685 F.2d 245 (8th Cir.1982), the court reversed and remanded for trial the customer's law suit for damages under TILA. Holding that the customer should have been given the opportunity to prove that the transaction was a credit sale rather than a lease, the court observed:
"... the legislative history of the TILA shows that Congress was aware that `some creditors would attempt to characterize the transaction so as to fall one step outside whatever boundary Congress attempted to establish, Mourning v. Family Publications Service, Inc., 411 U.S. 356, 365, 93 S.Ct. 1652, 1658, 36 L.Ed.2d 318 (1973) ...' and that it intended to include within the statutory definition of `credit sales' purported leases `if they are, in essence, disguised sale arrangements.' 1968 U.S.Code Cong. & Ad. News, 1962, 1980." Id. at pg. 248.
In Waldron v. Best T.V. & Stereo Rentals, Inc., 485 F. Supp. 718 (D.Md. 1979), the agreement provided that the customer who leased the television set for $16.80 weekly, could terminate at any time after the first week and would become the owner of the television if she made all seventy-eight weekly payments. The court ruled that even though the customer had a right to terminate after one payment, the agreement was essentially a contract for the sale of the television set; that the agreement remained in force unless the customer exercised her right to terminate and thereby forfeit all the equity she had built in the weekly payments, or committed a breach which would activate defendant's right to terminate.
Davis v. Colonial Securities Corp., 541 F. Supp. 302 (E.D.Pa. 1982), dealt with the lease of a house for a monthly payment of $150.00. The lessee agreed to make all repairs, to pay taxes, sewer and water charges, and interest on the unpaid balance. After one hundred and twenty payments and payment of one dollar, lessee would become the owner of the house. Observing that TILA's legislative history demonstrated Congress' intent to include in the definition of a credit sale those sales contracts which are disguised as leases, the court held that this was a credit sale under the federal act.
*250 Endeavoring to resolve the dispute regarding interpretation of a "credit sale," the Federal Reserve Board amended Regulation Z to except leases "leases terminable without penalty at any time by the consumer." 12 C.F.R. § 226.2(a)(16). The attempt has been unsuccessful.
In re Hanley, 135 B.R. 311, 313 (Bankr.C.D.Ill. 1990) interprets "penalty" as the imposition of an additional sum on the customer before permitting termination of the lease. See also, Remco Enterprises, Inc. v. Houston, 9 Kan. App.2d 296, 677 P.2d 567 (1984); Homeway Rentals v. Martin, 64 B.R. 1 (Bankr.S.D.Ga. 1984). Conversely, the "penalty" in Regulation Z has been viewed as the forfeiture incurred when the customer loses any accumulated equity in the property. In re Puckett, 60 B.R. 223, 239-240 (Bankr.M.D.Tenn. 1986), affirmed 838 F.2d 471 (6th Cir.1988).
A "forfeiture" is a divestiture of property. See, Berry & Ackley v. DeMaris, 76 N.J.L. 301, 312, 70 A. 337 (Sup.Ct. 1908). The words "penal" and "penalty" have different shades of meanings, depending on the context in which they appear. Wilentz v. Hendrickson, 133 N.J. Eq. 447, 468, 33 A.2d 366 (Ch. 1943), affirmed 135 N.J. Eq. 244, 38 A.2d 199 (E & A 1944). In its strict sense, however, "penalty" includes a forfeiture. 36 Am.Jur.2d, Forfeitures & Penalties, § 3, pg. 613. The "penalty" required by regulation Z, then, may properly be considered to include any forfeiture incurred when a rent-to-own customer loses equity accrued by reason of rental payments made prior to repossession. Under Continental's contracts with Iris Green and Roseann Levine, plaintiffs' equities consisted of forty percent of the lease payments made on account of each agreement.
The divergent views generated by TILA's "contracts-to-pay" language naturally recur from the "agrees-to-pay" language in the New Jersey Retail Installments Sales Act. N.J.S.A. 17:16C-1, et seq. There, a "retail installment contract" is defined as:
"... Any contract, other than a retail charge account or instrument reflecting a sale pursuant thereto, entered into in this state between a retail seller and a retail buyer evidencing an agreement to pay the retail purchase price of goods or services which are primarily for personal, family or household purposes, or any *251 part thereof, in two or more installments of time. This term includes a security agreement, chattel mortgage, conditional sales contract, or other similar instrument in any contract for the bailment or leasing of goods by which the bailee or lessee agrees to pay as compensation a sum substantially equivalent to or in excess of the value of the goods, and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming the owner of such goods upon full compliance with the terms of such retail installment contract."
The "agrees-to-pay" language was interpreted by the court in Maine to exclude rent-to-own contracts because a debtor-creditor relation is not established where the lessee is not deferring payment of a debt. Hawkes Television, Inc. v. Maine Bureau of Consumer Credit Protection, 462 A.2d 1167, 1171 (Me. 1983).
The statutes in Alabama and Maryland employ the "contracts-to-pay" language in defining a "credit sale" or "installment sale", respectively. Each state interpreted that language to exclude a rent-to-contract from its consumer protection statute because those agreements do not create an enforceable promise to pay. Givens v. Rent-A-Center, Inc., 720 F. Supp. 160, 162 (S.D.Ala. 1988); State v. Action TV Rentals, Inc., 297 Md. 531, 467 A.2d 1000, 1010 (1983).
Wisconsin's Consumer Act defines a "consumer credit sale," in part, as any agreement in the form of a bailment or lease if the bailee or lessee "pays or agrees to pay" as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the goods. W.S.A. 421.301(9). Under that language, the court in Palacios v. ABC TV & Stereo Rental of Milwaukee, 123 Wis.2d 79, 365 N.W.2d 882 (App. 1985), held that a rent-to own contract was a consumer credit sale where the creditor, in fact, paid more than the value of the goods.
Our own statute mandates that if RISA and TILA requirements are inconsistent, compliance with TILA is deemed to be compliance with RISA, N.J.S.A. 17:3B-1, and that when any conduct is a violation of both TILA and RISA, the penalty provisions of TILA shall supercede the penalty provisions of RISA where the federal penalty provisions are more severe. N.J.S.A. 17:3B-2. While our legislature has thus recognized the possibility of inconsistencies *252 between TILA and RISA, it has at least tacitly suggested, if not overtly directed, that wherever feasable, both statutes should receive the same interpretation. Moreover, precedent requires, and the similarity of languages demands, that both statutes be interpreted alike. E.g. Brewer v. Porch, 53 N.J. 167, 174, 249 A.2d 388 (1969).
The purposes underlying TILA and RISA clearly indicates the path to correct interpretation of these statutes. TILA was adopted to foster competition among financial institutions engaged in the extension of consumer credit, to ensure meaningful disclosure of credit terms to the consumer and to avoid the uninformed use of credit by consumers. 15 U.S.C. § 1601(a). RISA was one of several laws designed to protect consumers from over-reaching by others, to protect them from over-extending their resources, and to promote the availability of financing to purchase various goods and services. Girard Acceptance Corp. v. Wallace, 76 N.J. 434, 438, 388 A.2d 582 (1978).
It is clearly established in this state, as elsewhere, that remedial legislation is liberally construed to accomplish its social purpose. New Capitol Bar & Grill Corp. v. Div. of Employment Security, 25 N.J. 155, 160, 135 A.2d 465 (1957).
The intention of the legislature emerges from the principle and policy of the enactment, rather than from the literal sense of the particular terms standing alone. Literal terms give way to the spirit of the legislation and the words of the enactment may be expanded or contracted according to the manifest purpose of the statute. Caputo v. Best Foods, Inc., 17 N.J. 259, 264, 111 A.2d 261 (1955); Alexander v. N.J. Power & Light Co., 21 N.J. 373, 379, 122 A.2d 339 (1956); and Wright v. Vogt, 7 N.J. 1, 6-7, 80 A.2d 108 (1951).
Adherence to these principles requires the court to adopt the approach applied in those cases that view these transactions in a realistic and common sense way. It is appropriate to look beyond form to identify the substance of the transaction. It is appropriate *253 to penetrate the technique and reach the economic verity of the transaction. The substance of these agreements requires that they be viewed as sales agreements, not leases. The expectation of the customer is that he will make all the required payments and own the property. The economic incentive is ownership. The plaintiffs are entitled to the protections of TILA and RISA, so that they can clearly understand the cost of their intended acquisition.

II.

UNIFORM COMMERCIAL CODE
Although the "contracts to pay" and the "agrees to pay" language in TILA and RISA are juridically debatable, the application of the relevant definition of the Uniform Commercial Code, N.J.S.A. 12A:1-101, et seq. is beyond cavil. In defining a "security interest," N.J.S.A. 12A:1-201(37), the statute provides in part:
"... Whether a lease is intended as security is determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, (b) an agreement that upon compliance with the terms of the lease, the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the one intended for security."
The language of the agreement, not the subjective intent of the parties, determines the nature of the interests created. Leasing Service Corp. v. American National Bank & Trust Co., 19 UCC Rep. 252, 261, 1976 WL 23674 (D.N.J. 1976), citing Gilmore, Security Interests in Personal Property, § 11.2, at pg. 338. The inclusion of a contractual provision that upon compliance with the lease terms the customer shall become the owner of the property for no additional consideration, identifies the agreement as a security interest as a matter of law.
In BJL Leasing Corp. v. Whittington, Singer, Davis & Company, Inc., 204 N.J. Super. 314, 498 A.2d 1262 (App.Div. 1985), the owner-lessee of a 1969 Mercedes Convertible automobile entered into a sale-lease-back agreement with plaintiff. The contract called for 48 equal monthly payments of $291.00 to lease the *254 vehicle and granted the lessee the opportunity to re-purchase the vehicle for $1.00 at the end of the lease term. Upon default, the leasing company sought the return of the vehicle and the unpaid rental. The court concluded, however, that the transaction was a security transaction. Relying on the definition of security interest in the Uniform Commercial Code, the court stated:
"The final subsection quoted should have settled the question as to whether the contract was a true lease or a security agreement. It establishes the "lease" as a security agreement as a matter of law." Id. at pg. 320, 498 A.2d 1262.
That conclusion is amply supported elsewhere. In Matter of Fashion Optical, Ltd., 653 F.2d 1385, 1388 (10th Cir.1981), the court observed that if the agreement permits the "lessee" to become the owner for no additional consideration after complying with its terms, the "lease" is "deemed a secured transaction as a matter of law."
In In re Vaillancourt, 7 UCC Rep. 748, 759, 1970 WL 12563, Bankr. No. 69-151 N.D. (D.Me. 1970), the court concluded that if § 1-201(37)(b) is shown, there is no need to inquire into other terms of the agreement or into the circumstances surrounding the transaction. The message of that sub-section, according to the court, "is clear that the presence of such an agreement creates an irrebuttable presumption that a security transaction was intended."
See also Orix Credit Alliance, Inc. v. Pappas, 946 F.2d 1258, 1261 (7th Cir.1991); In re J.A. Thompson & Son, 665 F.2d 941, 943 (9th Cir.1982); Tackett v. Mid-Continent Refrigerator Co., 579 S.W.2d 545 (Tex.Civ.App. 1979).
Some cases weigh the factual circumstances presented in the case to determine whether the agreement is a lease or security instrument. In re Puckett, supra, In re Aguilar, 101 B.R. 481 (Bankr.W.D.Tex. 1989); In re Fogelsong, 88 B.R. 194 (Bankr. C.D.Ill. 1988). There is no reason to indulge in that analysis under sub-paragraph (b) of N.J.S.A. 12A:1-201(37).

*255 III.

NEW JERSEY CONSUMER FRAUD ACT
Another significant issue presented is whether these transactions are unconscionable, and therefore actionable, under the New Jersey Consumer Fraud Act. N.J.S.A. 58:8-1, et seq.
The relevant portion of the Consumer Fraud Act provides:
"The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretence, false promise, misrepresentation, or the knowing concealment, suppression or omission in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice...." N.J.S.A. 56:8-2.
A "sale" includes "any sale, or rental, distribution, offer for sale, rental or distribution, or attempt to directly or indirectly sell, rent, or distribute." N.J.S.A. 56:8-1. The act seeks to prevent deception, fraud or falsity in connection with the sale and advertisement of merchandise. Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 69, 494 A.2d 804 (1985); Fenwick v. Kay American Jeep, Inc., 72 N.J. 372, 376, 371 A.2d 13 (1977). Conduct which is not in good faith, honest in fact, and observant of fair dealing, is unconscionable, Kugler v. Romain, 58 N.J. 522, 544, 279 A.2d 640 (1971), and actual deceit or fraudulent intent is not necessary. Skeer v. EMK Motors, Inc., 187 N.J. Super. 465, 470, 455 A.2d 508 (App.Div. 1982). Intent is not an essential element of unconscionable practice. Fenwick v. Kay American Jeep, Inc., supra at pg. 378, 371 A.2d 13.
Plaintiffs are the kind of consumers to whom the statute should give special protection. See, Kugler v. Romain, supra, at pg. 544, 279 A.2d 640. They have little or no bargaining power and must accept the agreement that is proffered. In Howard v. Diolosa, 241 N.J. Super. 222, 574 A.2d 995 (App.Div. 1990), plaintiffs who were financially pressed, sold their home for a fraction of its value in a sale-leaseback arrangement. The purchaser was aware of plaintiffs' plight at the time they entered into the transaction. Even though plaintiffs understood the transaction and there was *256 no fraud, mistake, duress, or undue influence, the court found the agreement was unconscionable by reason of the bargaining disparity between the parties and the patent unfairness of the arrangement. The same elements exist here.
On account of the five agreements she made with Continental, Iris Green paid a total of $3,335.86 against the cash price of $2,785.12. Had she paid the agreements in full, she would have paid $6,663.85. Notwithstanding these payments, all of the household furnishings were repossessed. Had Continental distributed the payments in a different fashion (N.J.S.A. 17:16C-29 requires the allocation to be made first in-first out), Iris Green would not have lost all of the property.
Continental's formula to determine the cash price of the merchandise is to multiply the wholesale cost by 3.5 and then multiply that product by forty percent. To determine the total amount of the installments, the wholesale price is multiplied by 3.5. The amount of each installment is determined by dividing that product by the proposed number of installments. The difference between the cash price and the total amount of the installments is what Continental refers to as the "cost of leased services." There are no services. This is interest.
It is common knowledge that it is more expensive to purchase an item over time than to pay cash. The difference in the cost is interest, and it is appropriately considered to be a forbearance in the circumstances of this case. Forbearance arises because of Continental's right to demand either that the plaintiffs pay the installments as due or return the goods. If one looks merely at the form of the contract, it may appear that there is no forbearance because Continental has no right to demand an installment until each renewal period arises. However, the substance of the transaction determines whether it is usurious. Miller v. Colortype, Inc., CT. 92-6772 (D.Cr.Minn. 1992), citing Rathbun v. W.T. Grant Co., 300 Minn. 223, 219 N.W.2d 641, 647 (1974).
*257 N.J.S.A. 2C:21-19 prohibits a loan or forbearance with an interest rate exceeding 30% per annum. The interest rates here far exceed that limitation and constitute an unconscionable practice. See, Morgan v. Air Brook Limousine, Inc., 211 N.J. Super. 84, 510 A.2d 1197 (Law Div. 1986), and Swiss v. Williams, 184 N.J. Super. 243, 445 A.2d 486 (Dis.Ct. 1982), holding that, respectively, that the failure to comply with a requisite disclosure statement or the failure to provide a purchaser with the statutorily required recission notice each constitute a per se violation of the Consumer Fraud Act.

IV.

CONCLUSION
Plaintiffs and intervenors motions for partial summary judgment are granted. They present no genuine issue as to any material fact and plaintiffs are entitled to judgment as a matter of law. R. 4:46-2. The agreements in question are security interests, not leases. The provisions of TILA, RISA and the Uniform Commercial Code apply. And, as a matter of law, these agreements also violate the Consumer Fraud Act.
Defendants' motion for partial summary judgment, asserting plaintiffs' failure to establish a prima facie case of common law fraud, is denied. There is here a genuine issue of material fact as to whether statements made to these plaintiffs were made with an intent to deceive them. Summary judgment is ordinarily not granted where states of mind are in issue. E.g. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 76, 110 A.2d 24 (1955); Exxon Corp. v. Wagner, 154 N.J. Super. 538, 541, 382 A.2d 45 (App.Div. 1987).
Plaintiffs will please submit a form of order consistent with this opinion on five days' notice.