**Cassandra BURNEY, Dorothy J. Kelsey, and Gregory A. Stevenson, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**THORN AMERICAS, INC., a Delaware corporation, and Thorn Emi North America Holdings, a Delaware corporation, Defendants.**

Civil Action No. 95–C–1162.

United States District Court, E.D. Wisconsin.

Oct. 29, 1996.

William P. Dixon, Sarah E. Siskind, Davis, Miner, Branhill & Galland, Madison, WI, Seymour J. Mansfield, Mansfield & Tanick, Minneapolis, MN, Stephen E. Meili, Center for Public Representation, Madison, WI, David Ramp, Mid–Minnesota Legal Assistance, Minneapolis, MN, for Plaintiffs.

Stephen L. Morgan, Catherine Furay, Murphy & Desmond, Madison, WI, John C. Dods, Dennis Dow, Shannon Spangler, Shook, Hardy & Bacon, Kansas City, MO, Matthew J. Flynn, Katherine H. Grebe, Quarles & Brady, Milwaukee, WI, for Defendants.

## DECISION AND ORDER GRANTING SUMMARY JUDGMENT

REYNOLDS, District Judge.

This is not a case about the defendants' morality, nor is this a case about the plaintiffs' sophistication, nor is it a case about common-law notions of obligation. This is a case about whether federal or Wisconsin law governs the rent-to-own contracts used by Thorn America, Inc. ("Rent-a-Center") and, if the Wisconsin Consumer Act ("WCA"), Wis. Chs. 421–427, covers them, whether Rent-a-Center has complied with the statutory requirements. The motion before the court is about whether the rent-to-own contracts are consumer credit sales under the WCA, what violations, if any, Rent-a-Center has committed, and what damages, if any, the plaintiffs deserve.

Although the economic implications of the rent-to-own transaction are complicated, the facts are relatively straight-forward. Rent-a-Center customers may purchase an item outright by paying the retail price; alternatively, they may choose to rent the item. . As long as the customer continues making rental payments, the customer can continue to use the item. The customer can purchase the item by either exercising the early ownership provision or, after a certain number of payments, paying an option price. The plaintiffs believe these are consumer credit sales under the WCA and the federal Truth-in-Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, which would impose certain requirements on Rent-a-Center. The defendants disagree, arguing that neither act applies.

On October 19, 1994, the plaintiffs filed a class action, alleging violations of the WCA, TILA, Wis.Stat. § 138.04 (statutory limit on undisclosed interest), and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et. seq.* ("RICO"). On December 7, 1995, the court certified the class. Shortly thereafter, both parties moved for partial summary judgment. The defendants moved for summary judgment on the RICO claim, and the court has granted summary judgment for the defendants on the RICO claims.

The plaintiffs have moved for partial summary judgment on the following issues: (1) whether the WCA covers all transactions in which the plaintiffs have made payments equal to, or greater than, the item's value, *See* Wis.Stat. § 421.301(9); (2) whether the reinstatement fee is actually a delinquency fee under § 422.203; (3) whether Rent-a-Center has violated § 422.301 by failing to disclose the finance charge as an interest rate; (4) what the plaintiffs' actual damages are; (5) whether the amount financed in a rent-to-own contract includes only the retail price, *see* § 421.301(5); and (6) whether the interest rate for the rent-to-own contracts exceeded 5%, the maximum for undisclosed interest, *see* § 138.04.

Despite Rent-a-Center choosing the shotgun method of litigation and bombarding the court with voluminous arguments, the plaintiffs are largely correct, and the court grants summary judgment for the plaintiffs on all six issues, with some modification.

## UNDISPUTED FACTS

Before addressing the facts, the court will define four terms.

The retail price: the amount of money a customer must pay to buy an item outright.

The rental payment: the periodic payment required each week or month for the customer to retain possession.

The option price: the amount of money the customer may pay, after a predetermined number of rental payments, to own the item.

The total payments: the total amount of money the customer pays by making all the rental payments and by paying the option price.

Because the details are complicated, a brief example will provide an overview of the facts. A customer goes to a Rent-a-Center store, looking for a television. The television costs $450, which is the retail price. The customer can own the television by paying $450 immediately. Alternatively, the customer can rent the television for one week by paying $10, which is the rental payment. The customer can continue to rent the television by continuing to make weekly installments of $10. After 51 weeks, the customer can pay an additional $90 and will then own the television; this is the option price. Furthermore, Rent-a-Center will allow the customer to pay the $90 option price in weekly installments of $10. The total payments equal $600 (51 rental payments plus the option price.)

Rent-a-Center markets home furnishings, appliances, electronics, and other household products, targeting customers who cannot afford or do not wish to pay cash for goods. Although Rent-a-Center will sell its items outright, it focuses on rent-to-own transactions. The customer signs an contract for a one-week or one-month rental. At the end of the period, the customer may return the item or renew the agreement by making another rental payment. After a certain number of payments, the customer may exercise an option-to-own. Mostly, these customers have limited access to money or credit. (Pls.' Proposed Findings of Fact ["P.F.O.F."] ¶¶ 6 & 7.) The customer has the choice of whether to have weekly or monthly rental payments. (Pls.' P.F.O.F. ¶ 44.) If the customer chooses the monthly rate, Rent-a-Center multiplies the weekly rate by 4.333. (Pls.' P.F.O.F. ¶ 45.)

The customer has no legal obligation to continue making the payments; rather, the customer can stop making payments and return the item. (Defs.' Resp. Facts ["Resp. F."] to Pls.' P.F.O.F. ¶ 11.) If a customer does not make rental payments, the transaction is terminated, whether the customer is making rental payments or payments on the option price. The customer may reinstate the transaction by paying a $5 reinstatement

fee and may do this whether the customer is making rental payments or payments on the option price. (Pls.' P.F.O.F. ¶¶ 40, 59.) Many Rent-a-Center customers have paid reinstatement fees. (Pls.' P.F.O.F. ¶ 57.)

Rent-a-Center itself characterizes renting-to-own as an "innovative and highly flexible financing" proposition. (Pls.' Resp. to Defs.' P.F.O.F. Ex. N.) Besides renting, during a rental period, the customer may exercise an early purchase option. Under this option, the customer makes a one-time payment equal to 60% of the remaining payments needed to acquire ownership. (Defs.' Resp. Facts ["Resp. F."] to Pls.' P.F.O.F. ¶ 11.)

Also, after making a predetermined number of rental payments, the customer can buy the item by paying an option price. (Defs.' P.F.O.F. ¶ 6.) Rent-a-Center has always allowed customers to pay the option price in installments identical to the rental payments. (Pls.' Resp. to Defs.' Resp. F. Ex. A at 287.) At the beginning of the transaction, Rent-a-Center tells customers that they will be able to pay the option price in a series of installments. (Pls.' P.F.O.F. Ex. 8 at 189.):

> [S]tress to the customer that Rent-a-Center will extend credit to any customer [who] cannot pay the entire amount at once.... The weekly payment that the customer will make on the installment sale agreement will be equal to or less than the weekly payment they had for the rent-to-rent period.
>
> . . . .
>
> ... [T]he customer does not have to come up with a large sum of money at one time. They can pay off the merchandise with payments that are equal to or less than the payments they are currently making.

(Pls.' P.F.O.F. ¶ 31; Ex. 11 at 10 [Rent-a-Center's Wisconsin Purchase Plan Operations Guide].) Between 87–90% of the customers who pay the option price pay it in installments. (Pls.' P.F.O.F. ¶ 27.)

In every case, the retail price for Wisconsin consumers is 60% of the total payments required for ownership. (Pls.' P.F.O.F. ¶ 14.)

Originally, the option price formula was 8.7 times one weekly rental payment. (Pls.' P.F.O.F. ¶ 21.) In 1990, Rent-a-Center changed the option price formula to 9 times the weekly rental payment. (Pls.' P.F.O.F. ¶ 22.) In March 1994, after a Wisconsin court[1] found Rent-a-Center's option price to be nominal, Rent-a-Center increased the option price to ⅓ of the total payments and reduced the rental payments to ⅔ of the total payments. And, Rent-a-Center introduced a formal installment sale agreement for any customer who wished to pay the option price over time. (Pls.' P.F.O.F. ¶ 29.)

Rent-a-Center considered these changes "subtle in appearance and easy to apply" because the substance of the transaction remained the same. (Pls.' P.F.O.F. ¶ 30.) Customers made the same total payments to buy the item regardless of the changes in the option price. (Pls.' P.F.O.F. ¶ 24.) Rent-a-Center merely deducted the increased option price from the total payment price and reduced the number of rental payments correspondingly. (Pls.' P.F.O.F. ¶ 23.)

Shortly after the Wisconsin court decision, Rent-a-Center asked the Banking Commission to interpret the meaning of a nominal option price as used in Wis.Stat. § 421.301(9). (Pls.' P.F.O.F. ¶ 33.) On December 14, 1994, the Banking Commissioner issued an opinion interpreting nominality. If the option price was 12% or greater than the total payments, the option price was not nominal. If the option price was less than 12%, nominality would depend on the facts of the specific transaction. (Pls.' P.F.O.F. ¶ 34.)

Six weeks after the Banking Commissioner's interpretation, Rent-a-Center reduced its option price to 12% of the total payments. (Pls.' P.F.O.F. ¶ 36.) Again, the change in the option price did not change the total payments. (Pls.' P.F.O.F. ¶ 37.) From 1990–1994, when the option price was equal to nine weekly payments, 91.2 percent of those customers who reached the option date exercised their option-to-own. (Pls.' P.F.O.F. ¶ 48.) From April 1994–January 1995, when the option price was equal to one-

---

1. *Rent–A–Center, Inc. v. Hall,* 181 Wis.2d 243, 510 N.W.2d 789 (Ct.App.1993), 515 N.W.2d 715 (1994).

third of the total payments, 91.8 percent of those customers who reached the option date exercised their option-to-own. (Pls.' P.F.O.F. ¶ 49.)

Rent-a-Center provides delivery, repair, and maintenance service free to its customers. (Pls.' P.F.O.F. ¶ 51.) In other words, there is no separate charge for delivery, repair, or maintenance. If a rented item must be repaired outside the customer's home, Rent-a-Center provides a loaner. (Def. Add. Proposed Facts [D.A.F.] ¶ 2.) Whether the customer is making rental payments or paying the option price in installments, Rent-a-Center services the item for no additional charge. (Pls.' P.F.O.F. ¶ 41.)

Eighty-six percent of Rent-a-Center's customers intend to own the item when they enter into the rent-to-own transaction. (Pls.' P.F.O.F. Ex. 3 [Rudman Report] at 22). Nonetheless, only 30% of customers who enter Rent-a-Center rent-to-own transactions actually buy the item. (Defs.' Resp. F. ¶ 16.) Rent-a-Center loses 11% of its merchandise to theft or damage.

For the other transactions, 75% of the agreements are terminated without a purchase. 39.3 percent of Rent-a-Center's customers said they terminated because they no longer needed the item. 12.5 percent obtained a new item elsewhere; 3.6% moved out of the area, and 4.8% terminated for other reasons unrelated to ability to pay. (D.A.F. ¶ 7.)

## DISCUSSION

The court grants summary judgment if a reasonable jury must find for the moving party based on the undisputed facts, the nonmoving party's version of the disputed facts, and all reasonable inferences drawn in the nonmoving party's favor. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Although less common, a party may ask for and can receive summary judgment when it has the burden of proof. Moreover, the court may grant summary judgment as to a portion of the case, leaving the disputed issues for trial. Fed.R.Civ.P. 56(d)

On December 7, 1995, the court certified the following class:

> [A]ll persons who have entered into so-called "rent-to-own" contracts (also known as "rental-purchase transactions") in Wisconsin with the defendants, or any of their predecessors or successors in interest, from or after six years prior to the filing of the complaint, in a written form substantially similar to the contracts in their material terms to those executed by the plaintiffs.

Before reaching the merits, the court will modify the class. This modification will not expand the class. The modified class includes all persons who meet the following three criteria:

> (1) have entered into "rent-to-own" contracts ("rental-purchase" transactions) in Wisconsin with the defendants, or any of their predecessors or successors in interest,
>
> (2) have entered into those contracts after October 18, 1988, and
>
> (3) have either made rental payments equal to or greater than the item's retail price or are likely to make such payments in the future.

*A. Some of the rent-to-own transactions are consumer credit sales as a matter of law.*

Under the WCA, a consumer credit sale has two elements: (1) the customer must pay or agree to pay an amount equal to or in excess of the item's value, and (2) the buyer must either become owner for no additional or a nominal consideration. Wis.Stat. § 421.301(9).[2] The plaintiffs have moved for summary judgment as to those customers who "have actually paid ... the aggregate value of the goods." *Pls.' reply br.* at 2 (quotations omitted). As to the first element, the request is a tautology. Instead of using conclusory language, the court examines whether summary judgment is appropriate for those customers who have made rental payments equal to or greater than the item's retail price.

---

**2.** The texts of the relevant statutes are produced in the attached appendix.

■ The court grants summary judgment to the plaintiffs and holds that their rent-to-own transactions are consumer credit sales under the WCA because they can satisfy both criteria of a consumer credit sale.

### 1. *"Pays or Agrees To Pay"*

In Rent-a-Center's view, because the customer has no obligation to renew the rental agreement, there is no debt, and the WCA cannot apply. The court, however, starts with the statute. Regardless of traditional notions of debt, obligation, and forbearance, the Wisconsin legislature decided that some customers, even without incurring obligation, deserve the same protections as customers who enter traditional credit arrangements. Such a judgment makes sense if many rent-to-own customers enter those agreements with the hopes of purchasing the goods. Precisely because the transaction falls beyond common law definition of debt and credit, the legislature had to explicitly expand the protections of the WCA to cover rent-to-own transactions.

The WCA expanded the definition of a consumer credit sale by adding the word "pays" as an alternative to "agrees to pay." *See* § 421.301(9). The statute covers two situations: where there is obligation and where the customer has made payments equal to the item's value. Interpreting that simple and straightforward word "pays," a Wisconsin court held that a consumer credit sale included a rent-to-own transaction in which the consumer made rental payments of $1,652 on a stereo whose retail price was $800. *Palacios v. ABC TV & Stereo Rental,* 123 Wis.2d 79, 89, 365 N.W.2d 882, 887 (Ct. App.1985). The statute and *Palacios* would seem to reject the requirement of obligation. Even if the statute was at all ambiguous, the legislative history only confirms the holding in *Palacios.* In the original draft of the WCA, "pays" was absent; "pays" was added as part of a compromise bill between consumer groups and creditors. *See* 1971 Wis. Laws 38, Drafting file, Assembly subst. Amend (2) at 19–20. The legislature intentionally added the word "pays"; it is not for this court to ignore it.

The defendants have made a series of analogies—all of which are plausible in themselves—as a basis for their conclusion that the WCA requires proof of obligation. They argue that the court should interpret the WCA consistently with the Uniform Commercial Code ("U.C.C."), which requires proof of obligation. They argue that the court should interpret the WCA consistently with other states' consumer laws, which require proof of obligation. They argue that the Wisconsin Supreme Court has held that debt only occurs if there is an obligation pay. If all these other sources of legal authority require proof of obligation, the defendants conclude, so should the WCA's definition of consumer credit sale.

The defendants' ultimate conclusion, however, is unacceptable because it would make part of the statute meaningless. If the word "pays" requires obligation, then it is no different than the alternative phrase "agrees to pay"; "pays" would be superfluous.

The defendants' own attempt to propose an alternative meaning for "pays" only confirms the problems with their position. In their brief, the defendants argue that "pays" only creates a (apparently) rebuttable evidentiary presumption of obligation, Defs.' res. br. at 10, but a court may not demote an alternative to a rebuttable presumption. At oral argument, the defendants' stretched even further, arguing that the "pays" language covers only those transactions in which the consumer makes a down payment equal to the item's value. Of course, in that case, the consumer would just buy the item.

The addition of "pays" to the WCA's definition of a consumer credit sale also makes the defendants' analogies inapplicable. As to TILA, the defendants in *Palacios* made the same analogy. The *Palacios* court rejected it because of the WCA's additional language. 123 Wis.2d at 85, 365 N.W.2d at 886. The defendants argue that *Palacios* was decided before the TILA regulations excluded leases terminable without penalty. *See* 12 C.F.R. § 226.2(a)(16). First, that argument ignores that *Palacios* rested first on the differences between the two statutes. Second, some courts still interpret TILA to cover terminable leases. *See Green v. Continental Rent-*

*als*, 292 N.J.Super. 241, 678 A.2d 759 (Law Div.1994) and *In re Puckett*, 60 B.R. 223, 239–40 (Bankr.M.D.Tenn.1986) (holding that losing accumulated equity is a penalty).

The defendants argue that literally interpreting "pays" creates a dilemma because a transaction that is not a consumer credit sale at its inception can turn into a consumer credit sale. But, many of the WCA provisions require disclosure at the beginning of the transaction. First, that situation existed in *Palacios*. If the Wisconsin court applied the act to that situation, this court should not question the Wisconsin court's approach. Second, the existence of the dilemma would not change this court's view because adopting Rent-a-Center's view would make critical language superfluous.

The defendants' other analogies are even less persuasive. Rent-a-Center has already tried to convince a Wisconsin court to make the WCA's definition of "nominal" conform to the U.C.C.'s definition, but the Wisconsin court refused "to narrow the broad reach of the consumer act." by "usurp[ing] the legislative function and engraft[ing] onto section 421.301(9), Stats., the new Uniform Commercial Code provisions." *Rent–A–Center, Inc. v. Hall*, 181 Wis.2d 243, 254–55 n. 8, 510 N.W.2d. 789, 794–95 (Ct.App.1993). When the Wisconsin legislature amended its version of the U.C.C., *see* 1992 Wis. Act 148 § 48, it also amended portions of the WCA to bring it in conformity with the U.C.C., *see* 1992 Wis. Act 148 §§ 49–55. Because the legislature refused to change the definition of a consumer credit sale, the *Hall* court refused to infer a change that the legislature had rejected. *Hall*, 181 Wis.2d at 243–44. n. 8, 510 N.W.2d at 794–95.

The U.C.C. has no applicability in interpreting the WCA's definition of consumer act because the statutes have different language and because the U.C.C. covers commercial transactions involving highly sophisticated commercial actors—as compared to the average consumer. Especially when faced with a broad statute like § 421.301(9), the court should not artificially limit it by comparing it to statutes with different language and different purposes.

The same is true for the other state statutes. All of the statutes cited by Rent-a-Center cover only those transaction in which the customer actually agrees to pay. *Compare Hawkes Television, Inc. v. Maine Bur. of Cons. Credit Prot.*, 462 A.2d 1167, 1171 (Me.1983).

Finally, Rent-a-Center relies on *Dieck v. Unified Sch. Dist. of Antigo*, 165 Wis.2d 458, 477 N.W.2d 613 (1991). Under *Dieck*, a school district did not incur debt by signing a 20–year lease with an option-to-own because the district could terminate the lease by refusing to appropriate money to pay the rent. Without obligation, there was no debt. *Id.* at 472, 477 N.W.2d at 619. *Dieck* involved the interpretation of "debt" as used in the Wisconsin Constitution, *Id.* at 470, 477 N.W.2d at 618, not the interpretation of consumer credit sale as used in the WCA. Nothing in *Dieck* suggests or implies that "pays ... a sum substantially equivalent to ... the value of the goods" requires proof of obligation. Although proof of obligation satisfies the first criteria of a consumer credit sale, so does proof of paying a sum equal to the item's value.

Even if obligation is not a necessary element, the defendants dispute who has paid a "sum substantially equivalent to or in excess of the aggregate value of the goods." First, Rent-a-Center disputes the item's value. Rent-a-Center argues that the retail price is an item's value, but some of the parties' experts disagree. As this is summary judgment, the court takes Rent-a-Center's version of the disputed facts. At most, an item's value is no more than its retail price.

Rent-a-Center also argues that the court may not compare the total payments made with the item's retail price because each rental payment includes payment for services like delivery, repair, and the right to terminate. In Rent-a-Center's view, the court must deduct the value of delivery, repair, and terminability from each payment. Only when the total of the reduced payments exceeds the retail price has the consumer satisfied the first element.

As a matter of law, Rent-a-Center is incorrect; the total payments are the correct measure. The statute does not say that the

consumer must pay the item's value; rather, the consumer must pay "as compensation for use a sum" equal to the item's value. In other words, anything the customer pays as a condition of using the item counts. In these rent-to-own contracts, the consumers have no choice; to use the item, they must pay for service, and they must pay for the right to terminate. The weekly rental payment is the amount the plaintiffs must pay to use the item, so it is the sum of those payments that matters.

Adopting Rent-a-Center's view would create a loophole so large that WCA would provide no protection for any installment sale. Under Rent-a-Center's view, a store could easily avoid the WCA. It could sell an item for $800. Then, a consumer enters an installment contract and agrees to rent the item for eight months at $100 a month (total payments = $800); the store provides repairs. At the end of eight months, the consumer could buy the item for $200. Assuming the option price is nominal, this transaction, despite obligating payment would, under Rent-a-Center's view, not be a consumer credit sale. Because the court would have to deduct the value of services like repair, the total installments attributable to the use of the item would be less than the retail price.

Rent-a-Center's position is inconsistent with the language of § 421.301(9) and the policy of the WCA, and the court rejects it. When a plaintiff has paid rental payments whose sum is equal to or greater than the item's retail price, the transaction has satisfied the first element of a consumer credit sale.

### 2. The option price is nonexistent or nominal

The plaintiffs must also show that they can own the item either through no additional, or nominal, consideration. Wis.Stat. § 421.301(9). Although Rent-a-Center changed its formula for calculating the option price during the class period, three things remained constant. First, changing the option price had no effect on the total payments; rather, the number of rental payments needed up to the option date decreased when the option price increased. Second, regardless of what Rent-a-Center said was the option price, it allowed customers to pay the option price in installments. Third, Rent-a-Center told customers that they could pay the option price in installments when the customer first entered the rent-to-own agreement. For example, before *Hall*, a customer paid 51 rental payments of $10. After making the 51 payments, the customer could become the owner by paying the $90 option price, which could be paid in weekly $10 installments. After *Hall*, for the same item, the customer would make 40 weekly payments of $10. Then, customer paid a $200 option price, which could be paid in weekly $10 installments. The total number of rental payments and the total payments are the same. *See* fig. 1. Because the customer can pay the option price in installments, the Rent-a-Center option price is a formal distinction without meaning or merit and masks the customer's build-up of equity interest in the item.

---

CHANGE IN RENT–A–CENTER'S OPTION PRICE
(fig. 1)

Before Rent–a–Center v. Hall

| Rental Period | Option Price: $90 |
| --- | --- |
| 51 weekly $10 payments | Payable in 9 weekly payments of $10 |

TOTAL NUMBER OF PAYMENTS = 60

TOTAL PAYMENTS TO OWN = $600

| Rental Period | Option Price: $200 |
|---|---|
| 40 weekly $10 payments | Payable in 20 weekly payments of $10 |

TOTAL NUMBER OF PAYMENTS = 60
TOTAL PAYMENTS TO OWN = $600

■ Generally, an option price is nominal when it is significantly less than the item's fair market value at the time the customer exercises the option-to-own. *In the Matter of Marhoefer Packing Co.*, 674 F.2d 1139, 1144 (7th Cir.1982). Comparison to the fair market value reveals whether the customer has accumulated any equity in the item. If the transaction is a pure lease, the customer is paying for the use of the item (measured as the reduction of the item's value over time) and other services. At the end of the lease, the lessor can sell the product for its fair market value. If the option price is less than the fair market value, a portion of the lease payments went towards purchasing the item; otherwise, there is no explanation for why the option price is less than the fair market value.[3] *See Puckett*, 60 B.R. at 238.

If the option price is insubstantial when compared to the item's fair market value at the time the customer exercises the option, the customer has no sensible alternative to paying the option price. When the option price equals or exceeds the fair market value, the customer can go to another retailer and buy the same item in the same condition at the same or lower price. Alternatively, if the option price is significantly less than fair market value, buying the same item in the same condition from another seller is a meaningless choice.

■ Under the WCA, even when the option price is equal to or greater than the item's fair market value, it may still be nominal. *Hall*, 181 Wis.2d at 254, 510 N.W.2d at 793–94. In consumer transactions, the resale market may be much less developed than the resale market in commercial transactions, making the comparison to the fair market value impractical and theoretical. In any event, Wisconsin uses four tests for nominality under the WCA: the option price's relation to the item's fair market value, the option price's relation to the total payments, the option price's relation to the original price, and the existence of sensible alternatives to paying the option price. *Id.* at 255, 510 N.W.2d at 794.

Rent-a-Center wants the court to compare what it designates as an option price with the various standards. But, "[t]hat which we call a rose by any other name would smell as sweet." William Shakespeare, *Romeo & Juliet* act. 2, sc. 2 1. 43. Similarly, installment payments are still installment payments even when grouped together and called an option price. To analyze an option price, the court must examine the customer's alternatives.

Paying the option price in installments equal to the rental payments is the same as making rental payments. In *Palacios*, the customer could become the owner by making 78 weekly payments. *Palacios*, 123 Wis.2d at 81, 365 N.W.2d at 884. Therefore, there was no option price; the transaction met the second element. The Rent-a-Center transactions are indistinguishable from the *Palacios* transaction. As Rent-a-Center readily admits, the customer can pay the rent, pay the option price in installments equal to the rental payment, and become the owner. During the option period, Rent-a-Center will provide the same services it did during the rental

---

**3.** If the option price is only slightly lower than the fair market value, the lessor may be offering the item at a discount to avoid the hassle of reselling the item; hence, courts look for an option price that is insubstantial compared to the fair market value.

periods. Although the name changes from the rental period to the option period, the transaction remains the same.

Rent-a-Center argues that Wisconsin has rejected this view. In *Hall,* the plaintiff made monthly payments of $77.96. After 19 months, the plaintiff could purchase the item for an option price of $161.91. Written on the contract was "+ 2 = 21 months." *Hall,* 181 Wis.2d at 246–247, 510 N.W.2d at 791. In the trial court's view, there was no option payment because the plaintiff could become the owner by making 21 monthly payments. *Id.* at 250, 510 N.W.2d at 792–93. The appellate court rejected this holding because two monthly payments equaled $155.92, not $161.91.[4] *Id.* at 251, 510 N.W.2d at 793. The Wisconsin court rejected the installment argument because the factual support was lacking, not because it was legally insufficient.

Furthermore, Rent-a-Center has not explained how paying the option price in installments is any different to the customer than making rental payments. Instead, Rent-a-Center argues that the opportunity to pay the option price in installments is meaningless because the court must examine the transaction at its inception and because some customers who exercise the option make one payment or pay in installments larger than the rental payments.

An option means choices, the choices the customer has instead of ending the transaction. Any alternative to ending the transaction (by not paying the option price) matters—including paying the option price in installments. Even if Rent-a-Center were correct that the beginning of the transaction is the only relevant time, Rent-a-Center admits that it tells customers they have the right to pay the obligation in installments.

■ Nor is the fact that some customers pay the option price in amounts greater than the periodic rents relevant. For example, a credit card holder can pay the monthly bill at once (and avoid interest charges), pay the minimum, or pay something in between. Just because some people pay their bill off entirely each month does not mean that the

right to make monthly payments is meaningless. The same is true for the Rent-a-Center transactions. As long as customers have the opportunity to become the owner by paying the option price in installments, there is no option price, even if some people pay the option price in larger and fewer payments than the rental installments.

Before *Hall,* Rent-a-Center tried to avoid the WCA with the lowest possible option price. When it failed, it could have just raised the option price. Doing so could have had repercussions. If the customer is looking to buy the item, then a large one-time option price is a drawback and may prevent the customer from ever buying the item.

That is the point of the option price. It tells the customer whether or not part of the rental payments will be building equity in the item. If the rental payments are not building equity, it is a true rental agreement—the customer is paying only for the use of the goods. If the customer is buying the item, the customer deserves and the lessor must provide the protections of the WCA. Instead of just increasing the option price, Rent-a-Center called multiple rental payments an option price. For this court to accept that as an option price would rob the WCA of all of its force.

### 3. The Banking Commissioner's Letter

Rent-a-Center argues it is in a safe harbor created by the Banking Commissioner. The Banking Commissioner has the authority to issue interpretations of the WCA. Wis.Stat. § 426.104(1)(e). Moreover, no one can be penalized for following any interpretation issued by the Banking Commissioner. § 426.104(4)(a). On December 14, 1994, the Banking Commissioner issued a letter stating that any option price that was at least 12% of the total payments was not nominal. Rent-a-Center, therefore, argues that none of the transactions after December 14, 1994, which had a 12% option price, can be consumer credit sales.

The safe harbor is much smaller than Rent-a-Center contends. If a defendant follows a Banking Commissioner's opinion, "[n]o

4. The court upheld the trial court's second ground, finding that $161.91 was nominal.

provision of chs. 421 to 427 ... which imposes any penalty shall apply." § 426.104(4)(a). By limiting the protection to provisions that impose a penalty, the statute fosters compliance over litigation. For example, if the Banking Commissioner issued an interpretation about how to charge an additional fee, a party could not be penalized for incorrectly charging an additional fee if it followed the Banking Commissioner's letter. The provision applies to attempts at compliance. But, the December 14, 1994 letter interpreted the scope of the WCA.

■ If the court interpreted § 426.104(1)(a) to prevent application of the WCA, the court would be limiting the scope of, and not fostering compliance with, the act. Section 421.301, which defines a consumer credit sale, imposes no penalty; it defines the scope of the act. If the transaction is a consumer credit sale, the seller must make certain disclosures; if it is not a consumer credit sale, the disclosure requirements do not apply. Being subject to a disclosure requirement is not a penalty.

Even if the court interpreted § 426.104 as Rent-a-Center wants, the statute would not protect Rent-a-Center. The Banking Commissioner required an option price of at least 12% of the total rentals. As the court has already explained, Rent-a-Center does not have a real option price. Therefore, Rent-a-Center has not acted in conformity with the Banking Commissioner's December 14, 1994 letter.

### B. The Reinstatement Fee is a Delinquency Fee

The Wisconsin Consumer Act limits when a party may charge a delinquency fee and how much the party may charge for late payment. Wis.Stat. § 422.203. The plaintiffs argue that Rent-a-Center's reinstatement fee is a delinquency fee. Rent-a-Center argues that a reinstatement fee is different than a delinquency fee because a reinstatement fee is not a penalty. If the customer does not pay on time, the customer can return the item with no penalty or pay the reinstatement fee. The reinstatement fee, argues Rent-a-Center, does

not penalize the customer for not making payments on time.

The reinstatement fee is legally indistinguishable from a delinquency fee. The Wisconsin legislature has already provided customers in consumer credit transactions with the same rights regarding delinquency fees as Rent-a-Center gives its customers with reinstatement fees. If a customer of a consumer credit transaction misses a payment, the customer may cure the problem within 15 days of receiving notice by paying the unpaid balance and the delinquency fees. § 425.105. If the customer does not want to cure, the customer can return the goods or the seller can repossess the goods; in either case, the customer is not liable to the merchant for the unpaid amounts if the amount is less than $1,000. § 425.209(2). In other words, either the customer pays the delinquency fee and reinstates the transaction or returns the item without being liable for the remaining debt.

■ Although there are some differences between the rights under the act and the rights in the Rent-a-Center transactions, they are differences of degree, not substance. The only other court to examine reinstatement fees in rent-to-own contracts has come to the same conclusion. *Pennsylvania v. Riverview Leasing, Inc.*, 167 Pa.Cmwlth. 32, 648 A.2d 580, 585–86 (Commw.Ct.1994). Finally, as the plaintiffs note, if Rent-a-Center is correct and the reinstatement fee is not a delinquency fee, then Rent-a-Center could not charge a reinstatement fee at all because it would not be a charge allowed by the WCA. *See* § 422.202. Because the Rent-a-Center reinstatement fee functions the same as a delinquency fee, it is a delinquency fee.

Rent-a-Center could assess a reinstatement fee only if payment was more than 10 days late, and the fee could be no more than $10 or 5% of the unpaid balance.

### C. Rent-a-Center Has Violated the Disclosure Requirements.

Under the WCA, a merchant must disclose the interest rate of a consumer credit trans-

action as an annual percentage rate. § 422.301 (*incorporating* requirements under 15 U.S.C. § 1638). Rent-a-Center concedes that it does not disclose interest rates and has violated § 422.301.

### D. Damages for a Violation of § 422.301

To assess damages, the court must determine what the finance charge is in these transactions. Because the damage issue involve many statutory terms and various versions of the same equation, the following chart court outlines the court's approach.

CHART ON DAMAGES
fig. 2

DAMAGES = FINANCE CHARGE *—5% (maximum allowed for undisclosed interest) (*infra* sec. D(1))

TOTAL PAYMENTS = FINANCE CHARGE + AMOUNT FINANCED ** (*infra* sec. D(2))

AMOUNT FINANCED = CASH PRICE # + ADDITIONAL CHARGES ## (*infra* sec. D(2))

TOTAL PAYMENTS =

FINANCE CHARGE + (CASH PRICE + ADDITIONAL CHARGES) (*infra* sec. D(2))

FINANCE CHARGE =

TOTAL PAYMENTS [less] (CASH PRICE + ADDITIONAL CHARGES) (*infra* sec. D(2))

* Wis.Stat. § 421.301(20)
** Wis.Stat. § 421.301(5)
# The Cash Price = the price at which property or services are offered for sale for cash. Wis.Stat. § 421.301(7)
## Charges allowed by Wis.Stat. § 422.202

Plaintiffs may recover $25 of statutory damages and their actual damages for each violation of § 422.301. § 425.302(1). The measure of damages is the difference between the finance charge and a 5% interest rate, because the defendants have provided no evidence to the contrary. Moreover, the finance charge includes everything except the retail price because the other services are neither available in an outright sale nor optional.

#### 1. The Appropriate Damage Measure

■ There are two ways to measure damages. The damages could be the difference between what the plaintiffs paid in finance charges and the 5%, which is the amount of undisclosed interest allowed by law. *See* § 138.04. Alternatively, the damages could be the difference between what the plaintiffs paid in finance charges and the best interest rates they could have received in the market. *See Hickey v. Great W. Mortgage Corp.,* 158 F.R.D. 603, 610–11 (N.D.Ill.1994). Even if Rent-a-Center is correct and the damages

are the difference between the finance charges and market rate, Rent-a-Center must prove what that rate would have been. *Footville State Bank v. Harvell,* 146 Wis.2d 524, 534, 432 N.W.2d 122 (Ct.App.1988).

In *Harvell,* the plaintiff who had violated the WCA argued that it should recover the reasonable value of the interest it lost because the defendant made late payments. Without evidence of what the market rate would have been, the court allowed only the 5% statutory rate. Here, the defendants have offered no evidence on what the rate would have been. Therefore, the plaintiffs can use, and the court will rely on, the 5% allowed by § 138.04.[5]

The defendants distinguish this case from *Harvell* and *Severson Agri–Service, Inc. v. Lander,* 172 Wis.2d 269, 493 N.W.2d 230 (Ct.App.1992), because, in those cases, the lender was trying to recover what it was owed as opposed to the customer trying to recovered paid interest. The customer could raise the disclosure violations as a defense, and the lender could recover only 5% interest. If this distinction were relevant, the results would be absurd. For example, Z makes a loan to A and another loan to B; Z, however, never tells A or B about the 10% annual interest built into the repayment plan. A pays back the money and discovers that Z could only charge 5%. When B never repays the money, Z sues B. Under the defendants' view, B could raise the violation of § 422.301 as a defense, and Z could only collect 5% interest, but A would collect only the difference between the finance charge and the market rate. The result is unprincipled and illogical.[6]

Rent-a-Center also argues that the 5% allowed by § 138.04 is an add-on rate and not a *per annum* rate. But, Wisconsin Courts treat § 138.04 as a *per annum* rate. *Severson,* 172 Wis.2d at 274, 493 N.W.2d at 230 (Ct.App.1992) ("On remand, the trial court shall recalculate interest at five percent annually under sec. 138.04, Stats., and render judgment accordingly.")

### 2. The Amount Financed Includes Only the Retail Price

■ Each rental, or periodic, payment has two components; one part goes toward the amount financed and the other part is the finance charge. In this case, the amount financed is the rental price. Rent-a-Center, however, argues that it provides services (like delivery, maintenance or terminability), whose cost should be added to the amount financed. Like Rent-a-Center's designation of an option price and reinstatement fee, calling something a service does not exclude it from being a finance charge.

The WCA is, in a large part, a disclosure statute. Easily understandable and accessible information is the best protection for consumers. Requiring disclosure is meaningless, however, if the merchant can hide the cost of buying over time. The merchant can hide the cost by calling part of the finance charge an additional charge, which will make the finance charge appear lower than it is. Therefore, the act specifically defines a finance charge as any charge that is a condition of the extension of credit. § 421.301(20).

To avoid any ambiguity with the phrase "a condition of the extension of credit", any charge not part of the amount financed (in

---

5. It is not clear whether *Harvell* means that actual damages are the difference between the actual finance charge and the market rate. In *Harvell,* the court was examining whether the lender should receive the fair value of the capital loss due to late payments. That differs from people who pay undisclosed interest rates on time, because, in the former case, the lender has lost the use of the money, creating a *quantum merit* issue. As to those people who paid an excessive rate on time, the appropriate measure may always be the difference between the actual rate and 5%. If one views charging excess, undisclosed interest as a contract breach, the plaintiffs' damages would put them in as good of a

position as if the contract had not been breached. Because the contract did not disclose an interest rate, Rent-a-Center could honor the contract only by charging 5% interest. In any event, the court need not decide this issue because the defendants lack factual support for their legal position.

6. On March 8, 1996, the court denied the defendants motions for summary judgment on the plaintiffs' § 138.04 claim. In less detail, the court stated that actual damages for a disclosure violation of the WCA would be the difference between the actual interest rate charge and 5%. *See* March 8, 1996 Decision and Order at 3–4.

this case the retail price) is part of the finance charge. The amount financed includes the cash price and certain other allowable additional charges. § 421.301(5). The cash price includes any item or services the merchant offers "for sale for cash." § 421.301(7). "For sale for cash" means that the person can buy the service by paying cash. If a service is available only to those who are buying over time, that service is a hidden cost of financing and is part of the finance charge.

For an additional charge to be part of the amount financed, the customer must have the chance to refuse the service. *See generally* § 422.202. If the customer buying the item over time has no alternative but to take the additional service and pay the additional cost, such a charge is a condition of the extension of credit and part of the finance charge.

Both sides agree that the retail price is part of the amount financed. The conflict is over what else, if anything, is part of the amount financed.

Rent-a-Center argues that the cost of delivery, which it provides, is not part of the amount financed. The plaintiffs argue that Rent-a-Center advertises that delivery is free and must live with that representation. The plaintiffs' argument misses the relevant facts. By advertising free delivery, Rent-a-Center means that there is no additional charge for delivery, which has no bearing on whether the cost of delivery is part of the amount financed or the finance charge.

Nonetheless, because Rent-a-Center offers delivery free to a customer who pays the retail price outright (and does not enter the rent-to-own transaction), Rent-a-Center factors the cost of delivery into the retail price. So, although Rent-a-Center is correct that the cost of delivery is part of the cash price, Rent-a-Center may not count the cost of delivery twice. Therefore, the cost of delivery has no impact on the measure of the amount financed beyond the retail price.

Like delivery, Rent-a-Center provides maintenance, including replacements if Rent-a-Center must repair the item outside of the customer's home. Most of the items, however, come with a warranty, which is already included in the retail price. In some cases, Rent-a-Center's maintenance service is longer or better than the warranty. Rent-a-Center argues that this extra service is a service "related to the sale" and part of the cash price. § 421.301(7)(a). To be part of the cash price, however, it must be a service offered "for sale for cash." Rent-a-Center has offered no evidence that a customer paying the full retail price can pay an additional fee and obtain the same type of service the rent-to-own customer receives; therefore, the extra services is not for sale for cash.

Nor is the extra repair service an allowable additional charge. The extra service is the same as an extended service contract. Such a charge is allowable only if not required as part of the transaction. § 422.202(2s)(a)(4). The Rent-a-Center customers have no choice—they must accept the service. When the merchant forces the customer to accept a charge that is allowable only if the customer has a choice, that charge is part of the finance charge. § 422.202(2s)(b)(3)(a).

The greatest dispute is over terminability. Rent-a-Center customers can return goods without penalty at the end of any rental period. In Rent-a-Center's view, the cost of terminability is not part of the finance charge because it "is the cost to RAC [Rent-a-Center] of *not* requiring its customers to incur an obligation and thus of *not* extending credit, and represents a corresponding value to consumers." (Defs.' Br. at 29–30) (emphasis in the original). Whether the court analyzes the definition of finance charge or the amount financed, however, terminability is part of the finance charge.

Because the WCA covers these transactions, the Rent-a-Center customers have the same protections as any other customer of a consumer credit sale. Finance charge includes "[i]nterest, time price differential and any amount payable under a discount or other system of additional charges." § 421.301(20)(a) If the cost of terminability is not squarely within the meaning of interest or time price differential, it falls within the broad catchall of "other system of additional charges."

The cost of terminability is the price the customer pays for not buying the item outright; it is equivalent to interest. *Fogie v. THORN Americas, Inc.,* 95 F.3d 645, 651 (8th Cir.1996).

Furthermore, the cost of termination is not part of the cash price because it is not "for sale for cash." § 421.301(7). Terminability exists only if the buyer chooses to purchase the item over a series of payments and not outright. As Rent-a-Center concedes, terminability is not one of the allowable charges under § 422.202. Any charge not part of the cash price and not allowed by § 422.202 is part of the finance charge. § 422.202(3)(a).

The amount financed includes only the retail price. All other charges and costs are part of the finance charge.

### E. Actual Damages

Even if Rent-a-Center did not disclose the actual interest rate, the plaintiffs have suffered no actual damages as long as the finance charge is less the 5%. But, because the retail price always equals 60% of the total payments and because the amount financed includes only the retail price, the finance charge exceeds the five percent, and the plaintiffs have established actual damages.

### REMAINING ISSUES

As the court understands the posture of this litigation, the following issues remain for a jury trial: (1) whether any of the transactions are consumer credit transactions under TILA; (2) whether Rent-a-Center's actions were unconscionable to the named plaintiffs (the court refused to certify the unconscionability claim); and (3) the amount of damages the plaintiffs deserve.

In the court's view, the remaining liabilities issues involve no disputed facts. Furthermore, the court would like the parties' views on how the case should proceed, both as to liability issues and to remedies. Therefore, within two weeks of the date of this order, the parties will submit status reports addressing the following issues: whether the court can resolve the remaining liability issues on summary judgment, how the court should decide the appropriate injunction, how

to effect notice, and how to decide the amount of damages. Before submitting their reports, the parties will meet and make a good-faith attempt to agree on how the case should proceed. Where possible, the parties should submit a joint status report.

### CONCLUSION

The court modifies the class to include everyone who meets the following three criteria:

(1) have entered into "rent-to-own" contracts ("rental-purchase" transactions) in Wisconsin with the defendants, or any of their predecessors or successors in interest,

(2) have entered into those contracts after October 18, 1988, and

(3) have either made rental payments equal to or greater than the item's retail price or are likely to make such payments in the future.

The court grants partial summary judgment to the plaintiffs.

The transactions are consumer credit transactions under the Wisconsin Consumer Act.

The reinstatement fee is a delinquency fee as defined by Wis.Stat. § 422.203(1).

Thorn Americas, Inc. has violated Wis. Stat. § 422.301 by failing to disclose the finance charge as an annual interest rate.

The measure of actual damages is the difference between the actual finance charge and the 5% per annum rate allowed by § 138.04.

The amount financed is equal to the retail price.

The parties will submit status reports within fourteen days of the date of this order.

### APPENDIX OF STATUTES

**Wis.Stat. § 421.301(5):**

"Amount financed" in a consumer credit transaction means the total of the following items from which any prepaid finance charge or required deposit balance has been excluded:

(a) In a consumer credit sale, the cash price of the real or personal property or services, less the amount of any down payment whether made in cash or in property traded in....

(b) In a consumer credit sale, the amount actually paid or to be paid by the creditor pursuant to an agreement with the customer to discharge a security interest in or a lien on property traded in; and,

(c) To the extent not included in par. (a) or (b):

1. Any applicable sales, use, excise or documentary stamp taxes;

2. Amounts actually paid or to be paid by the creditor for registration, certificate of title or license fees; and

3. Additional charges permitted by s. 422.202

**Wis.Stat. § 421.301(7):**

"Cash price" means the price at which property or services are offered, in the ordinary course of business, for sale for cash, and may include:

(a) The cash price of accessories or services related to the sale such as delivery, installation, alternations, modifications and improvements; and

(b) Taxes, to the extent imposed on the cash sale.

**Wis.Stat. § 421.301(9):**

"Consumer Credit sale" ... includes any agreement in the form of ... lease of goods or real property if ... the lessee pays or agrees to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the goods or real property involved and it is agreed that the ... lessee will become, or for no other or a nominal consideration has the option to become, the owner of the goods or real property upon full compliance with the terms of the agreement.

**Wis.Stat. § 421.301(20):**

"Finance charge" means the sum of all charges, payable directly or indirectly by the customer as an incident to or as a condition of the extension of credit, whether paid or payable by the customer....

The term includes the following types of charges to the extent that are not permitted additional charges under s. 422.202 or delinquency charges (s. 422.203) or deferral charges (s. 422.204):

(a) Interest, time price differential and any amount payable under a discount or other system of additional charges;

(b) Service, transaction, activity or carrying charge;

(c) Loan fee, points, finder's fee or similar charge;

(d) Fee for an appraisal, investigation or credit report;

(e) Any charge imposed by a creditor upon another creditor for purchasing or accepting an obligation of a customer if the customer is required to pay any part of that charge in cash, as an addition to the obligation or as a deduction from the proceeds of the obligation;

(f) Premium or other charge for guarantee or insurance protecting the creditor against the customer's default or other credit loss;

(g) Charges or premiums for credit life, accident or health insurance, written in connection with any consumer credit transaction to the extent they are not permitted as additional charges under s. 422.202; and

(h) Charges or premiums for insurance, written in connection with any action against loss of or damage to property or against liability arising out of the ownership or use of property to the extent they are not permitted as addition charges under s. 422.202.

**Wis.Stat. § 422.202(2s)(a)(4)**

A creditor may contract for and collect from the borrower, or include in the amount financed, any of the following:

....

Charges or fees for mechanical breakdown, extended warranty or maintenance service contracts or insurance if purchase of the contract or insurance is not required as a condition of the extension of credit.

**Wis.Stat. § 422.202(2)(b)(3)(a)**

For purposes of chs. 421 to 427, any charge not authorized by this section shall

be considered part of the finance charge. An additional charge authorized by this section but assessed in a manner inconsistent with this section is not part of the finance charge unless ... the creditor requires the charge as an incident to or a condition of the extension of credit.

**Wis.Stat. § 422.203:**

With respect to a consumer credit transaction other than one pursuant to an open-end credit plan, the parties may agree to a delinquency charge on any instalment not paid in full on or before the 10th day after its scheduled or deferred due date in an amount not to exceed $10 or 5% of the unpaid amount of the instalment, whichever is less.

**Wis.Stat. § 425.105(2):**

Except as provided in sub. (3), for 15 days after such notice is given, a customer may cure a default under a consumer credit transaction by tendering the amount of all unpaid instalments due at the time of the tender, without accelerations, plus any unpaid delinquency or deferral charges, and by tendering performance necessary to cure any default other than nonpayment of amounts due. The act of curing a default restores to the customer his rights under the agreement as though no default had occurred.

**Wis.Stat. § 425.209(2):**

If the merchant repossesses or accepts voluntary surrender of goods which were the subject of the sale and in which he has a security interest, the customer is not personally liable to the merchant for the unpaid balance of the debt arising from the sale of a commercial unit of the goods of which the amount owing at the time of default was $1,000 or less, and the merchant is not obligated to resell the collateral unless the customer has paid 60% or more of the cash price and has not signed after default a statement renouncing his rights in the collateral. § 425.209(2).

**Wis.Stat. 425.302(1):**

A person who commits a violation to which this section applies is liable to the customer in an amount equal to:

(a) Twenty-five dollars; and

(b) The actual damages, including any incidental and consequential damages, sustained by the customer by reason of the violation.

**Wis.Stat. § 426.104(4)(a):**

No provision of chs. 421 to 427 or of any statute to which chs. 421 to 427 refer which imposes any penalty shall apply to any act done or omitted to be done in conformity with any rule or order of the administrator or any written opinion, interpretation or statement of the administrator, notwithstanding that such rule, order, opinion, interpretation or statement may, after such act or omission, be amended or rescinded or be determined by judicial or other authority to be invalid for any reason.